UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JOHN DOE, on behalf of JANE DOE, his minor child,

Civil Action No.:

Plaintiff,

-against-

**COMPLAINT**

CROTON-HARMON UNION FREE SCHOOL
DISTRICT AND CROTON-HARMON SCHOOLS
BOARD OF EDUCATION,

**Jury Trial Demanded**

Defendants.

------------------------------------------------------------------X

Plaintiff John Doe ("John" or "Plaintiff"), on behalf of Jane Doe ("Jane"), his minor child, by and through the undersigned counsel, sues Defendants, Croton-Harmon Union Free School District (the "School District") and Croton-Harmon Schools Board of Education (the "Board") and seeks damages, declaratory relief, and permanent injunctive relief against Defendants, and any other and further relief that this Court deems just and proper, and states as follows:

## THE NATURE OF THIS ACTION

1.      On October 29, 2016, Jane was sexually assaulted at an off-campus party by two classmates at Croton-Harmon High School (the "High School") while a third classmate stood watch.

2.      Despite her contemporaneous report of the sexual assault to both the High School and the Yorktown Police Department, her assailants engaged in school-wide bullying and harassment of Jane on campus.

3.      The bullying and harassment toward Jane were in retaliation of her report of sexual assault and, therefore, governed by Title IX of the Education Amendments of 1972.

4.      All Defendants were advised about the bullying and harassment toward Jane.

5.    The continued bullying and harassment made Jane's continued participation and attendance in school nearly impossible.

6.    Defendants failed to take reasonable measures to address the bullying and harassment.

7.    Defendants failed to provide Jane with reasonable accommodations to enable her to complete her education off-campus.

8.    Due to Defendants' egregious mishandling of Jane's Title IX complaint, she has been forced to withdraw from the High School and enroll at another high school in a different county ("New High School"), a process made more difficult by the High School and School District's obstructionist efforts.

## THE PARTIES

9.    Plaintiff John Doe is a resident of the State of New York.

10.    Plaintiff Jane Doe is resident of the State of New York.

11.    Defendant School District is a school district with a principal place of business located at 10 Gerstein Street, Croton-on-Hudson, New York.

12.    Defendant Board is a school board with a principal place of business located at 10 Gerstein Street, Croton-on-Hudson, New York.

## JURISDICTION

13.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff states claims arising under federal law.

14.    This Court has personal jurisdiction over all Defendants because all Defendants reside or conduct business in Westchester County, New York, and the acts or omissions giving rise to this Complaint occurred in Westchester County, New York.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. The High School and School District Employees

15.     During the events described herein, Alan Capasso ("Capasso") was the Principal of the High School.

16.     During the events described herein, Edward Fuhrman ("Fuhrman") was the superintendent of the School District.

17.     During the events described herein, Deborah O'Connell ("O'Connell") was the assistant superintendent of the School District.

18.     During the events described herein, Mark Maxam ("Maxam") was the assistant principal of the High School.

19.     During the events described herein, Erica Fiorini ("Fiorini") was the Dean of Students of the High School.

### B. The Incident

20.     In the fall of 2016, Jane was a freshman student at the High School.

21.     On October 29, 2016, Jane and a friend were invited to an off-campus party where they were told to expect other freshman students from the High School who were also invited.

22.     Several freshman students from the High School found out about the party and attended despite not being invited.

23.     During the party, Jane was sexually assaulted by two freshman students while another freshman student served as a lookout (the "Incident"). None of the three freshman students were invited to the party.

24.     The next day, Jane went to the Yorktown Police Department to file a complaint.

**C. First Notice to the High School**

25.     On the evening of October 30, 2016, John contacted Capasso to discuss the Incident and informed Capasso which students were involved.

26.     During the conversation, John informed Capasso that there would be protective orders against the boys who sexually assaulted Jane in place shortly.

27.     John also advised Capasso that Jane had been receiving harassing messages from other students who were friends of the boys involved in the Incident.

28.     The boys were popular students at the High School and had already begun a campaign of bullying and harassment toward Jane.

29.     John urged Capasso to take immediate action to prevent further harm to Jane.

30.     John suggested keeping the boys out of school or separating them from the other students because he was concerned that the boys' popularity combined with the small size of the school would turn the rest of the students against Jane and lead to the dissemination of false rumors.

31.     Capasso ignored John's suggestions and took no steps to protect Jane or safeguard her educational rights.

**D. Second Notice to the High School**

32.     On October 31, 2016, Jane continued to receive harassing messages and verbal threats as a result of the Incident and learned that the boys' friends were threatening physical violence against her.

33.     One of the boys' friends told Jane, "Nobody likes you. It's not worth coming back to school."

34.     A second student, also friends with the boys, stated, "If she comes back to school, I'll beat her up and break her legs."

35.     Another student, a former friend of Jane's, stated, "Low blow dude."

36.     During this time, Jane was receiving treatment at the Rape Crisis Unit at Northern Westchester Hospital.

37.     Capasso had been informed the previous evening that Jane would not be in school so that she could receive this treatment.

38.     After learning about the messages that Jane received while receiving treatment for the Incident, John scheduled a meeting with Capasso the very next day.

39.     During the meeting with Capasso on November 1, 2016, Jane and John advised that the harassment campaign against Jane continued unabated *via* verbal communications, text messages, and social media messages. For example, a group of students started a social media campaign denoted by the hashtag, #freetheboys.

40.     Many harassing messages were sent to Jane via Snapchat, which is a multimedia messaging app.

41.     Snapchat servers are designed to automatically delete all messages after they've been viewed by all recipients, usually within 24 hours.

42.     As a result, not all harassing messages were preserved.

43.     Among the many taunting and harassing Snapchat messages, Jane received an ominous message via Snapchat depicting a young girl passed out, face down, lying on the ground in a revealing dress from the night of the off-campus party.

44.     Jane and John provided Capasso with photo evidence of the harassing messages that Jane was able to preserve.

45.     Jane and John also provided Capasso with the names of the students involved in the threatening and harassing behavior that was linked directly to Jane's sexual assault.

46.     A speakerphone call with the Yorktown Police Department was held during the meeting.

47.     During that call, Capasso became aware that arrest warrants were signed for two of the three boys involved in the Incident and that protective orders would be issued as soon as possible.

48.     John informed Principal Capasso that the third boy, despite not being subject to an arrest warrant, also posed a major threat to Jane, as his best friend had spearheaded the harassment campaign against her.

**E.  Third Notice to the High School**

49.     On November 2, 2016, John emailed Capasso the orders of protection against the two boys who sexually assaulted Jane.

50.     The orders of protection required the boys to stay away from Jane, including her home and school, to the extent possible as determined by the School District.  The boys were prohibited from communicating with Jane through any method, including social media. Additionally, the boys were prohibited from, *inter alia*, committing assault, harassment, menacing intimidation, or threats to Jane.

51.     Once again, John requested that Capasso use his authority as principal to keep the three boys involved in the Incident away from Jane so that she could attend school.

52.     John also informed Capasso that Jane was subjected to additional bullying and harassment over social media as a result of the Incident.

53.     On November 3, 2016, John provided Capasso with proof of the ongoing bullying and harassment related to Jane's sexual assault.

54.     John also asked Capasso how Jane was supposed to attend school safely when the mother of the boy who served as the lookout during her sexual assault was a school employee.

55.     Within five days of the Incident, Jane and John provided an abundance of uncontroverted, contemporaneous evidence that other High School students were harassing Jane to the point where she was publicly ostracized and excluded from participating in her education.

56.     Defendants ignored this evidence and did not take any measures to protect Jane so that she could attend school.

57.     Jane was denied the benefit of her education as a result of Defendants' inaction in the face of the initial reports of harassment.

58.     Unfortunately, nothing would change as the harassment continued.

**F. Defendants Fail to Address Jane's Ongoing Harassment**

59.     On November 3, 2016, John informed the School Board, Croton Harmon Parent-Teacher-Student Association (the "PTSA"), school psychologist Dr. Eric Rosen, Fiorini, Fuhrman, and O'Connell about the harassment and abuse that Jane continued to endure as a result of her sexual assault.

60.     Other parents also voiced their concerns about Jane's treatment and the intimidation that their children were facing as a result of the toxic atmosphere at the school.

61.     Fuhrman asked for specific information, including the actions taken by students against Jane and messages supporting the harassing behavior.

62.     This information had already been provided to Capasso.

63.     Despite Jane's situation now being a matter of public concern, no substantive or reasonable measures were taken by Defendants to address the unrelenting invectives aimed at Jane that were interfering with her education.

64.     The only action taken by Defendants in response to the growing harassment and bullying of Jane was to hold a student assembly on November 4, 2019.

65.     The assembly did not directly address Jane's allegations.

66.     Instead, the focus of the assembly was "making the right choices".

67.     Prior to the assembly, Capasso advised John and Jane that no further issues should occur after the assembly but, if further issues arise, they should notify him so that the Defendants could take swift and severe action against the offending students.

68.     While the assembly was not directly addressed to the boys' conduct and retaliation, the boys knew it was conducted in response to Jane's allegations against them.

69.     Immediately following the assembly, the lookout boy's best friend told High School students, "If you haven't already blocked Jane, block her. If we find out that you did not block her, we will come after you."

70.     John emailed Capasso on November 5, 2016 to report that Jane was being shunned by her classmates on social media at the urging of the lookout boy's best friend and a female student.

71.     John identified both of these students by name.

72.     Capasso was made aware that any student who failed to comply with the coordinated shunning would be similarly ostracized for being on Jane's side.

73.     Despite being provided with the names of the students leading the isolation effort, Capasso took no action to address this further interference with Jane's education.

74.     After he failed to receive a response from the High School, John called Fuhrman on November 10, 2016 to complain about the inaction at the High School and the hostile environment that continued to exist at the High School as a result of this inaction.

75.     Neither the High School nor the School District took any action in response to Jane's complaints, which were directly related to Jane's sexual assault.

76.     John contacted Fuhrman and Capasso on November 15, 2016 to inform them that Jane's grades and educational opportunities were suffering as a result of the unchecked bullying, harassment, and shunning that was occurring on their watch.

77.     Parents of other students also expressed concern for Jane *via* email and urged the High School to take some action to protect her.

78.     Once again, no action was taken by the High School or the School District to protect Jane despite repeated requests to do so backed by concrete evidence and supported by unsolicited appeals from uninterested third parties.

79.     On November 17, 2016, John once again contacted Capasso and Fuhrman regarding the ongoing harassment campaign against Jane following her sexual assault.

80.     John noted that one female student in particular who was adamant in her harassment and bullying was now sending threatening messages to Jane through Jane's friends.

81.     John identified this female student by name and indicated that she was one of the students that was causing Jane to remain out of school.

82.     Despite possessing this information, neither Capasso nor Fuhrman took any action.

83.     John also informed Capasso and Fuhrman that Jane's classmates were shunning a student who came forward to support Jane and threatening other students with the consequences of standing up for Jane.

84.     On November 18, 2016, John again requested that Fuhrman set up a meeting with him and Jane.

85.     Fuhrman did not respond.

86.     The lookout boy's mother was an employee at the High School.

87.     Between November 17, 2016 and November 23, 2016, John learned from other parents that the lookout boy's mother was potentially responsible for turning some of Jane's teachers against her. For example, her English teacher ceased giving Jane work and issued her a low grade.

88.     This suspicion was reported to the High School, but no action was taken.

89.     On November 23, 2016, John requested a meeting with Fuhrman, Capasso, and the Board.

90.     No meeting was ever scheduled.

91.     On November 30, 2016, John emailed Capasso and Fuhrman, noting that the bullying, harassment, and shunning of Jane continued unabated and prevented Jane from attending school since the sexual assault occurred.

92.     John, once again, identified by name the female student who had been ferrying threatening messages *via* Jane's friends and stated that her harassment of Jane was ongoing.

93.     John's November 30, 2016 email further stated that Jane's grades were suffering as a result of the unmitigated harassment.

94.     Defendants did not take any substantive or reasonable action in response to the repeated harassment against Jane.

### G. Jane Appeals Directly to the High School and School District at a Public Meeting

95.     On December 1, 2016, Jane attended the scheduled Board meeting with her parents.

96.     At the meeting, Jane addressed the Board, the PTSA, High School administrators, and School District administrators, as well as members of the public, regarding the continued harassment she had endured as a result of the High School's and School District's failure to act in the wake of her sexual assault.

97.     Jane begged for some relief from the torment she had been subjected to for the past month.

98.     Following Jane's speech, several parents of other High School students addressed the Board with their concerns over the High School and School District's handling of the matter.

99.     Defendants were presented with a public cry for help from Jane and a request by the High School community to remedy the ongoing harassment that Jane continued to suffer as a result of her status as a sexual assault victim.

100.    Defendants took no substantive action to remedy the harm that Jane continued to suffer.

**H. Continued Harassment and False Rumors Spread by High School Staff**

101.    Jane and John met with Fiorini and Maxam on December 6, 2016 to discuss the continuing harassment related to her sexual assault.

102.    During the meeting, Jane and John provided specific examples of the harassing behavior and identified the students engaging in the harassing behavior.

103.    Jane and John also provided Maxam with screenshots documenting the harassment.

104.    At this point the High School, School District, Board, Capasso, Fuhrman, and O'Connell were aware of the ongoing harassment for more than a month.

105.    Still, they failed to take any reasonable or substantive action even when presented with additional evidence of the harassment that Jane continued to experience as a result of her status as a sexual assault victim.

106.    Additionally, after being informed on December 13, 2016, that staff members at the High School were spreading the false rumor that "Jane was unable to provide evidence of the harassment," Defendants did nothing.

## I.   The Clearly Unreasonable and Negligent Reintegration Plan

107.   The High School and School District failed in their attempt to integrate Jane back into school.

108.   On December 16, 2016, Jane and John were presented with a plan for having Jane return to school on December 19, 2016.

109.   School psychologist Dr. Eric Rosen was supposed to follow Jane at all times during the day, and the boys involved in the Incident were supposed to use separate entrances, stairs, hallways, and exits.

110.   Neither of these promises were kept.   Ultimately, administrators told Jane that it "wasn't possible" to implement the plan previously proposed.

111.   At certain points, Dr. Rosen was nowhere to be found despite assurances that he would be shadowing Jane.

112.   In fact, as soon as Jane arrived at the High School on the morning of December 19, 2016, Dr. Rosen was not present and Jane saw one of her assailants.

113.   Even when Dr. Rosen was near, his presence caused Jane further embarrassment, isolation, and stigmatization, and he did nothing to prevent other students from making fun of her or uncomfortably glaring at her.

114.   Additionally, the boys involved in the Incident were given free reign of the school throughout the day.

115.   Jane was repeatedly forced to be in the presence of the boys who perpetrated and facilitated her sexual assault.

116.   Dr. Rosen did nothing to stop the boys from being near Jane.

117.   Even more concerning, one of the boys who sexually assaulted Jane walked right in front of her and used an entrance that he was not permitted to use.

118.     Despite Jane exiting school and bursting into tears at the end of the day, Dr. Rosen asserted that things "went alright."

119.     John emailed the High School on December 19, 2016, noting that Jane could not safely attend school because of the persistent mental health and physical safety concerns.

120.     Following this communication, Defendants failed to take any substantive or reasonable actions to safeguard Jane so that she could safely pursue her education.

**J.  Defendants Deny Jane Access to Education**

121.     Defendants neglected to take any action to protect Jane from the onslaught of harassment related to her sexual assault that prevented her from attending school and taking advantage of her educational opportunities.

122.     Defendants also failed to provide any reasonable and adequate alternative accommodations so that Jane could continue her studies in a safe environment.

123.     Notably, the tutoring hours that Defendants promised to provide were inconsistent and woefully inadequate.

124.     No tutor was supplied until November 16, 2016, more than two weeks after Jane's inability to safely attend the High School became apparent.

125.     After tutoring was provided, there was significant confusion regarding the availability and assignment of the tutors.

126.     Defendants were initially unclear regarding how many hours of instruction Jane was entitled to.

127.     Defendants eventually informed John and Jane that Jane would receive ten (10) hours of tutoring per week.

128.     However, Jane rarely received the promised weekly hours of tutoring.

129.    In fact, she would sometimes go multiple weeks without receiving instruction or feedback in certain classes.

130.    After several complaints, Defendants informed John and Jane on December 21, 2016 that Jane would be able to carry over tutoring hours that were not provided in 2016 into 2017.

131.    Defendants also told John and Jane that Jane could transfer unused tutoring hours from one class to another.

132.    Notwithstanding, Jane continued to receive inconsistent and insufficient tutoring hours in 2017.

133.    Defendants failed to notify Jane that her Spanish tutor from 2016 would not be working with her in 2017.

134.    On January 4, 2017, John requested that Defendants provide more tutoring hours for Jane as promised on December 21, 2016.

135.    On January 10, 2017, Defendants informed John that Jane could not have any additional tutoring hours because the unprovided tutoring hours from 2016 could not be carried over into 2017.

136.    Defendants also called the companies that two of the tutors worked for and insinuated that Jane was at fault for repeatedly cancelling sessions, which was simply not true.

**K. Defendants Deny Jane a Safety Transfer**

137.    Throughout the months of November 2016, December 2016, and January 2017, John repeatedly requested a safety transfer for Jane so that she could continue her education in a normal classroom setting free from harassment.

138.    During this timeframe, Defendants were unable and unwilling to provide a safe and complete educational environment for Jane.

139.    John's requests for a safety transfer were repeatedly denied.

140.    In lieu of a transfer, John requested tuition reimbursement so that Jane could attend another school.

141.    In Westchester County, it is well-known that if a student does not reside in the district of his/her school, he/she will be responsible for "non-resident tuition" in order to attend such school.

142.    This request was also denied.

143.    As a result of these repeated and unfounded denials, Jane's family was forced to rent a home in a nearby county so that she could attend a different high school to continue her education.

144.    Jane was finally able to enroll at New High School on February 27, 2017.

**L. Defendants Continue to Enable Retaliation After Jane's Transfer**

145.    Because she was forced to transfer during the middle of the 2016-2017 school year, Jane had some academic responsibilities that she needed to fulfill at the High School even after she enrolled at New High School in order to meet curriculum requirements.

146.    One of these obligations was a project for her physical education class, which she dutifully turned in before the end of the last month of the 2016-2017 school year.

147.    She did not receive a grade for this project until September 10, 2017.

148.    Jane had been a member of the High School girls lacrosse team prior to the Incident.

149.    The High School's physical education teacher was the coach of the girls lacrosse team.

150.    Jane had made complaints to her lacrosse coach against several former teammates related to harassment and threats following the Incident.

151.    Jane received a low grade in physical education without any explanation or feedback.

152.    Jane was previously an "A" student in physical education.

153.    This low grade was retaliatory.

154.    Jane received a low grade in English without any explanation or feedback.

155.    Jane was previously an "A" student in English.

156.    This low grade was retaliatory.

**M. Defendants Failed to Uphold Their Obligations Under Title IX**

157.    As noted extensively above, Defendants repeatedly failed to provide appropriate interim measures after learning about the harassment Jane was suffering as a victim of sexual assault.

158.    John and Jane provided well-documented evidence of the continued harassment that Jane suffered as a result of her status as a sexual assault victim.

159.    John, Jane, and other members of the High School community repeatedly requested that Defendants remedy the ongoing harassment.

160.    Defendants refused to enact any substantive and reasonable safety measures to protect Jane from continued harassment.

161.    Defendants did not comply with the protective orders issued by the Yorktown Police Department.

162.    Defendants did not provide any true academic support while Jane was unable to attend school.

163.    When Jane attempted to return to school with the assurance that protective measures would be enacted, Defendants could not deliver on their promises and instead caused Jane to suffer further harassment, harm, exclusion, and abuse.

164.    Defendants failed to identify the High School's Title IX Coordinator.

165.    It took multiple requests for Jane and John to find out that O'Connell was the Title IX Coordinator.

166.    This information was not provided until January 3, 2017, more than two months after Defendants were notified of the harassment.

167.    Defendants did not provide their employees with adequate Title IX training.

168.    Defendants failed to provide sufficient information regarding victim's rights and available interim measures online, in the Student Handbook, or in any other location.

169.    Moreover, Defendants did not inform Jane or John of Jane's rights under Title IX.

170.    When Defendants undertook to investigate Jane's harassment and bullying complaint under Title IX, they focused on the off-campus sexual assault.

171.    This focus was improper and was done to shield Defendants from liability.

172.    Defendants did not complete the Title IX investigation until March 24, 2017.

173.    At that time, Defendants issued an investigation report outlining their "findings" and erroneously determined that the School District responded appropriately to Jane's complaint ("Investigation Report").

174.    This was nearly five months after Jane first made a complaint of harassment and well outside the 60 days recommended by the Department of Education's Office for Civil Rights.

175.    The investigation of Jane's claims was impermissibly biased and woefully inadequate.

176.    The evidence of the bullying and harassment by the boys involved in the Incident was ignored.

177.    There was no attempt to interview witnesses about the harassment and bullying Jane faced from the boys involved in the Incident or other High School students.

178.    Defendants completely overlooked the connection between Jane's sexual assault and the bullying and harassment related to her sexual assault that fundamentally and irreparably interfered with her education by preventing her from attending school.

179.    The Investigation Report indicates that Jane's first complaint to Defendants occurred on December 1, 2016.

180.    This statement was false.

181.    Defendants were made aware of the Incident, as well as the initial instances of harassment and retaliation, on October 30, 2016.

182.    Jane filed her complaint on November 3, 2016.

183.    Defendants' application of the Title IX process as applied to Jane's complaints was an abject failure.

### AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972 – Deliberate Indifference
### (Against the High School and the School District)

184.    John and Jane repeat and reallege each and every allegation hereinabove as if fully set forth herein.

185.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

186.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

187.    The High School and the School District receive federal funding.

188.    The Office for Civil Rights (OCR) is a sub-agency of the Department of Education and is charged with enforcing Title IX.

189.    OCR regularly issues guidance documents to schools on how to administer and comply with Title IX.

190.    OCR guidance informs the court's evaluation of the adequacy of a school's procedures pursuant to Title IX.

191.    On April 4, 2011, OCR sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter").

192.    The April 2011 Dear Colleague Letter, while now revoked, was in effect when the underlying allegations took place in this case.

193.    To comply with Title IX, a school's investigation of sexual misconduct must in all cases be prompt, thorough, and impartial.

194.    A school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation.

195.    In discussing whether OCR will consider complaint resolutions to be timely, the April 2011 Dear Colleague Letter noted that a typical investigation takes approximately 60 calendar days.

196.    Jane first reported her sexual assault and related harassment to Defendants on October 30, 2016.

197.    Defendants had actual notice, since at least October 30, 2016, that Jane continued to receive harassing messages and verbal threats as a result of the Incident, including threats of physical violence.

198.    In November 2016, Capasso advised John and Jane that the Defendants would take swift and severe action against the offending students if the harassment and bullying continued.

199.    Yet, the harassment and bullying continued unabated.

200.    Defendants did not begin its investigation of Jane's allegations until December 17, 2016 and did not complete its investigation until March 24, 2017.

201.    Title IX requires schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual harassment.

202.    Defendants did not have an established and/or published grievance procedure to process Title IX complaints, including complaints of sexual harassment.

203.    Pursuant to Title IX, schools must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities.

204.    John and Jane were unaware that O'Connell was the designated Title IX Coordinator for the High School.

205.    There was no notice identifying O'Connell as the "Title IX Coordinator" or providing her contact information for students.

206.    Additionally, O'Connell failed to identify herself as the Title IX Coordinator when John and other parents voiced their concerns about Jane's sexual assault and harassment at the November 3, 2016 Board meeting.

207.    Pursuant to Title IX, even if the underlying sexual assault occurred off-campus, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus and must process the complaint in accordance with its established procedures.

208.    Defendants had no established procedures to process Jane's complaint or evaluate whether there was a hostile environment on campus for Jane stemming from her sexual assault.

209.    Under Title IX, the school should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator(s) and those acting on behalf of the perpetrator(s).

210.    Defendants did not take steps to protect Jane from further harassment or retaliation from her perpetrators.

211.    Instead, Defendants focused their "investigation" of Jane's allegations on the off-campus sexual assault only.

212.    Defendants failed to adequately or impartially investigate relevant facts related to Jane's report of harassment and bullying.

213.    Defendants failed to interview any relevant witnesses related to Jane's report of harassment and bullying.

214.    Defendants were motivated by gender biases when they failed to perform a thorough and impartial investigation of all evidence and witnesses identified by Jane.

215.    The Investigation Report placed improper weight on Jane's inability to participate.

216.    Defendants were advised that Jane was too traumatized to participate.

217.    The harassment towards Jane was severe, pervasive, and objectively offensive.

218.    Defendants acted with deliberate indifference to a known sexual assault and related harassment against Jane so as to create an intimidating, hostile, offensive, and abusive school environment in violation of Title IX.

219.    Defendants' deliberate indifference was motivated by Jane's female gender.

220.    Jane was effectively denied equal access to the High School's resources and opportunities.

221.    Defendants exercised "substantial control" over the harassers and the context in which the harassment occurred.

222.    Defendants' actions were clearly unreasonable.

223.    By reason of the foregoing, Jane is entitled to a judgment ordering damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972 - Retaliation**
**(Against the High School and the School District)**

224.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

225.    Pursuant to Title IX, schools are obligated to have policies and procedures in place to protect against retaliatory harassment.

226.    Pursuant to Title IX, schools must take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator(s) and those acting on behalf of the perpetrator(s).

227.    Pursuant to Title IX, the school should advise the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

228.    Jane was engaging in a protected activity under Title IX when she reported her sexual assault to Defendants.

229.    Jane was engaging in a protected activity under Title IX when she reported the harassment that she suffered as a result of her status as a victim of sexual assault.

230.   Defendants knew Jane was engaging in a protected activity under Title IX when she reported her sexual assault.

231.   Defendants knew Jane was engaging in a protected activity under Title IX when she reported the harassment that she suffered as a result of her status as a victim of sexual assault.

232.   Jane was subjected to materially adverse actions after she engaged in the aforementioned protected activities.

233.   The lookout boy's mother was an employee at the High School.

234.   Between November 17, 2016 and November 23, 2016, John learned from other parents that the lookout boy's mother was potentially responsible for turning some of Jane's teachers against her.

235.   Staff members of the High School spread false rumors that "Jane was unable to provide evidence of the harassment," which subjected Jane to further retaliation.

236.   Defendants failed to address their employees' retaliatory actions.

237.   Jane was unable to attend school after she engaged in the aforementioned protected activities.

238.   Jane was denied adequate educational instruction after she engaged in the aforementioned protected activities.

239.   Jane was subjected to harassment based on her status as a female sexual assault victim after she engaged in the aforementioned protected activities.

240.   Jane received an unwarranted, lower-than-normal "B" grade in physical education after she engaged in the aforementioned protected activities.

241.   The materially adverse actions suffered by Jane were causally related to the aforementioned protected activities.

242.    Before Jane engaged in the aforementioned protected activities, she was able to attend school.

243.    Before Jane engaged in the aforementioned protected activities, she received adequate educational instruction.

244.    Before Jane engaged in the aforementioned protected activities, she was not subjected to harassment based on her status as a female sexual assault victim.

245.    Before Jane engaged in the aforementioned protected activities, she had always received top grades in her classes.

246.    Defendants were aware that Jane was unable to attend school because she had engaged in the aforementioned protected activities.

247.    Defendants were aware that Jane was not receiving adequate educational instruction because she had engaged in the aforementioned protected activities.

248.    Defendants were aware that Jane was subjected to harassment based on her status as a female sexual assault victim because she engaged in the aforementioned protected activities.

249.    Defendants were aware that Jane received unwarranted, lower-than-normal grades in her courses because she engaged in the aforementioned protected activities.

250.    Defendants refused to take reasonable and appropriate measures after Jane engaged in the aforementioned protected activities.

251.    Defendants' refusal to take reasonable and appropriate measures after Jane engaged in the aforementioned protected activities caused the adverse actions.

252.    By reason of the foregoing, Jane is entitled to a judgment ordering damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

(i)     on the first cause of action, a judgment ordering damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, expenses, costs, and disbursements;

(ii)    on the second cause of action, a judgment ordering damages in an amount to be determined at trial, including pre-judgment interest, attorneys' fees, expenses, costs, and disbursements; and

(iii)   awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

**Dated:** **New York, New York**
        **August 30, 2019**

                                    **WARSHAW BURSTEIN, LLP**
                                    *Attorneys for Plaintiff Jane Doe*

                            By:
                                    **Kimberly C. Lau, Esq.**
                                    **James Figliozzi, Esq.**
                                    **575 Lexington Avenue**
                                    **New York, New York 10022**
                                    **(212) 984-7709**